IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.                           ) | CRIMINAL NO. 2005-2J |
| ) | |
| ROBERT F. SKEFFERY, a/k/a    ) | JUDGE GIBSON |
| "Clyde Ferron,"              ) | |
| ) | |
| Defendant.         ) | |

# Memorandum Opinion and Order

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion to Suppress Evidence (Document No. 15), Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 16) and Motion to Suppress Evidence of Prior Deportation and Related Motion to Dismiss Count I of the Indictment with Citation of Authorities (Document No. 17). The Government does not oppose the Defendant's Motion to Dismiss Count I of the Indictment and the Court will not await a further motion by the Government to dismiss this count but, rather, will grant the Defendant's motion to dismiss Count I without analysis. *See* Government's Brief (Document No. 27), pp. 3-4. Defendant's other motions will now be evaluated.

**Motion to Suppress Evidence (Document No. 15)**

FINDINGS OF FACT

    1.    Pennsylvania State Police Trooper Westley R. Berkebile (hereinafter "Trooper Berkebile") was assigned to traffic patrol on the Pennsylvania Turnpike (hereinafter "Turnpike") on August 14, 2004 and was positioned in an unmarked patrol vehicle

     outside the eastern entrance to the Allegheny Tunnel monitoring westbound traffic entering the tunnel at approximately 2:50 a.m. Transcript (Document No. 34, hereinafter "T"), pp. 8, 28.

2. Trooper Michael Volk (hereinafter "Trooper Volk") was located adjacent to Trooper Berkebile in a second unmarked vehicle. T, pp. 9, 112.

3. Trooper Berkebile observed a Chrysler 300, dark blue in color, decrease its speed abruptly almost to the point of completely stopping on the Turnpike in the passing (left) lane ten to twelve feet in front of Trooper Berkebile's location and then the vehicle behind the Chrysler correspondingly decreased speed abruptly and almost collided with the Chrysler. T, pp. 9-10, 74, 168, Defendant's Exhibit 9.

4. The Defendant appeared to have slowed down below the minimum posted speed limit of forty miles per hour when he was traveling past Trooper Berkebile's position, but this was not confirmed by means of "clocking" or a "radar device" and Trooper Berkebile did not issue a citation for this apparent traffic violation. T, pp. 104-105, 121.

5. Trooper Berkebile then pulled onto the right lane of the Turnpike and into the Allegheny Tunnel in order to follow the Chrysler which continued traveling in the passing (left) lane. T, pp. 10-11.

6. At the time Trooper Berkebile pulled onto the Turnpike to follow the Defendant, Trooper Volk pulled out and followed the vehicle that almost collided with the Defendant and conducted a traffic stop of that vehicle on the other side of the Allegheny Tunnel and issued a warning notice to the driver of that vehicle at approximately 2:45 a.m. for speeding and following too closely. T, pp. 113-114, 124.

7. Trooper Berkebile had to accelerate the speed of his vehicle in order to follow the now accelerating Chrysler and placed himself behind it but remained in the right lane and followed it for three-tenths of a mile and maintained an equal distance from it in order to "clock" the Chrysler's speed in the Allegheny Tunnel. T, pp. 12-13, 77-78, 107.

8. The Chrysler was found to be traveling seventy-five miles per hour in a fifty-five miles per hour zone by Trooper Berkebile's "clocking" of that vehicle from the right lane of the Turnpike. T, pp. 13, 14, 80.

9. The speedometer that was in Trooper Berkebile's unmarked vehicle had been certified to be accurate two days prior to his encounter with the Chrysler. T, pp. 13-14. Government Exhibit 1.

2

10. Trooper Berkebile activated his emergency lights and siren at the end of the Allegheny Tunnel and effected a traffic stop of the Chrysler on the left side of the Turnpike outside of the Allegheny Tunnel. T, pp. 14-15, 82, 168-169.

11. Trooper Berkebile parked his vehicle seven to eight feet directly behind the Chrysler, exited his vehicle dressed in full uniform, including his weapon which was not drawn, and approached the vehicle and identified Robert F. Skeffery (hereinafter "Defendant") as the driver of the vehicle. T, pp. 16-17.

12. Trooper Berkebile explained to the Defendant that he had been stopped because of his abrupt decrease in speed that almost caused an accident and requested his driver's license, registration and the vehicle's rental agreement in lieu of insurance documentation. T, pp. 16-17.

13. Defendant provided a driver's license identifying him as "Clyde Ferron" and an out-of-date rental agreement for the Chrysler, but no registration or insurance document. T, pp. 17-18, 170.

14. Trooper Berkebile noticed several air fresheners in the Chrysler and " the overwhelming odor of raw marijuana emanating from the vehicle." T, pp. 18-20, 21-22, 38, 82, 84-85, 86-87, 89.

15. Defendant appeared to be nervous when initially interacting with Trooper Berkebile but did not appear to be under the influence of drugs or alcohol; Trooper Berkebile continued to speak with the Defendant after receiving his documentation, inquiring as to the performance of the vehicle and the name of the person who rented it, to which the Defendant responded "James," the Defendant's girlfriend's uncle, and the Defendant further indicated that he had borrowed the Chrysler to travel to Philadelphia and was at this time returning to Pittsburgh. T, pp. 21-23, 39, 82, 107-108, 176, 182-183, Defendant's Exhibit 11.

16. Trooper Berkebile then returned to his vehicle, ran computer checks on the Defendant's license, the Chrysler's registration, a criminal history of Mr. "Ferron"; the Chrysler's registration check revealed no "hits", but the name "Clyde Ferron" revealed an FBI number with which Trooper Berkebile requested a criminal history through his dispatch and obtained a "detailed criminal history" revealing numerous convictions in Pennsylvania for possession and possession with intent to distribute controlled substances as well as the fact that the Defendant may be a previously deported felon. T, pp. 23-24, 25-26, 103-104.

17. Trooper Berkebile then called for Sergeant Anthony DeLuca (hereinafter "Sergeant DeLuca") "for safety sake" because he was planning to request consent from the Defendant to search the Chrysler, and Sergeant DeLuca arrived while Trooper Berkebile was running a computer check on the Defendant's license and approached the Chrysler's driver's side door and told the Defendant that Trooper Berkebile would be issuing him a warning and would be with him in a few moments; Trooper Berkebile thereafter prepared a warning notice to the Defendant for violating the maximum speed limit, and then approached the Chrysler's driver's side door and asked the Defendant to step to the rear of the Chrysler, where Trooper Berkebile returned all of the Defendant's documents and then gave the warning notice to the Defendant and had him sign it. T, pp. 26-27, 29, 91-93, 140-142, 147, 173-175, Government Exhibit 2.

18. Trooper Berkebile then explained to the Defendant that he should have his name placed on the rental agreement and then the Defendant signed the warning issued by Trooper Berkebile and he was told that he was free to leave and Trooper Berkebile then "began to walk to [his] patrol car." T, pp. 27-28, 29, 38, 93, 97, 99.

19. The Defendant "re-approached" Trooper Berkebile and spoke to him about the rental agreement, specifically the updated rental agreement, and the Trooper responded that he did not have to show him an updated rental agreement, but Trooper Berkebile then asked the Defendant if he had any "contraband" in his vehicle such as weapons or illegal substances to which the Defendant responded, "Not that I know of." T, pp. 29-30, 96-98, 102, 147-148, 154-155, 162, 164.

20. Trooper Berkebile then asked the Defendant if he could search the Chrysler and the Defendant gave an oral consent to search the vehicle. T, pp. 31-32, 108, 148, 150, 162.

21. Trooper Berkebile did not yell or raise his voice to the Defendant, did not draw his weapon and only touched the Defendant once when he shook the Defendant's hand after issuing the warning notice. T, pp. 150-151, 187.

22. Trooper Berkebile did not "pat down" the Defendant, but asked him to stand in front of his patrol car along with Sergeant DeLuca while he conducted the search; and Trooper Berkebile in his search discovered marijuana packaged in plastic akin to being "shrink wrapped" in Saran wrap in the trunk by accessing the trunk through the fold-down rear passenger seat of the vehicle, then walked back to the Defendant, handcuffed and arrested him and placed the Defendant in the rear seat of his patrol vehicle. T, pp. 32-34, 88, 100, 126, 130, 148-149, Defendant's Exhibits 4, 6, 8.

4

23. The Defendant was not "mirandized" when placed in Trooper Berkebile's patrol vehicle. T, pp. 35, 100, 149.

24. Having previously smelled marijuana coming from the Defendant's person, Trooper Berkebile asked the Defendant if he had smoked marijuana earlier that day and the Defendant indicated that he had; Trooper Berkebile then gave the Defendant his *O'Connell*[1] warnings pursuant to the Pennsylvania law regarding implied consent to urinalysis and, in response, the Defendant told Trooper Berkebile that it would be a waste of time to obtain a urinalysis because he had smoked marijuana earlier in the day and "it would be in his system." T, pp. 36, 100-101.

25. The Defendant made "a lot of movements in the back" of the patrol vehicle while being transported to the Somerset Barracks; after he was removed from the patrol vehicle at the Barracks, a small amount of marijuana that was wet and had appeared to have been chewed was on the floor of the rear of the vehicle. T, pp. 37-38.

26. When conversing with the Defendant, Trooper Berkebile did not raise his voice, threaten the Defendant or touch his weapon and the Defendant appeared to hear and understand Trooper Berkebile's questions by answering appropriately in English. T, pp. 39-41.

27. Defendant understands and speaks English and was educated in the United States from the time he was eleven years old through the completion of the eleventh grade. T, pp. 185-186

28. Trooper Berkebile could not identify the Defendant in the Chrysler as it passed him on the Turnpike. T, pp. 74-75.

29. The time of the traffic stop from when the vehicles were pulled off the Turnpike until the time of the issuance of the warning notice was approximately fifteen to twenty minutes and the subsequent consensual search of the Chrysler lasted approximately four minutes. T, pp. 33, 92.

30. Following his traffic stop of the vehicle which almost collided with the Chrysler operated by the Defendant, Trooper Volk proceeded to drive on a road above the tunnel and remained there until summoned via radio to the location of the Chrysler. T, pp. 123-124.

---

[1] *Commonwealth of Pennsylvania, Dept. Of Transportation, Bureau of Public Safety v. O'Connell*, 521 Pa. 242, 555 A.2d 873 (1989).

31. Trooper Volk arrived at Trooper Berkebile's location at a time after Sergeant DeLuca had arrived and Trooper Berkebile had discovered the marijuana. T, p. 114.

32. After his arrival at Trooper Berkebile's location, Trooper Volk assisted in gathering evidence and then verbally "mirandized" the Defendant at 3:05 a.m. when he was seated in Trooper Berkebile's patrol vehicle. T, pp. 114-116, 124, 178.

33. The Defendant responded to the inquiry as to whether he wanted to waive his Miranda rights by indicating that he did not "know anything about anything"; Trooper Volk made no further inquiries at this time. T, pp. 116, 117-118.

34. At the scene of the Defendant's traffic stop, Trooper Volk thereafter "assisted in gathering the evidence that had been found", which included various items; and he noticed that the rear seat and floor of the Chrysler were saturated with the smell of an air freshener, and the smell of raw marijuana. T, pp. 116-117, 122, 124-125, 139.

35. Trooper Volk also took photographs of the evidence. T, pp. 117, 129-130.

36. Approximately thirty to forty-five minutes later at the Police Barracks, Trooper Volk questioned the Defendant regarding what appeared to be a "baggie" with some unidentified substance within it, with Trooper Volk specifically asking the Defendant if he had eaten any illegal substances or eaten what was in the baggie and the Defendant responded that he had eaten the weed inside the baggie. T, pp. 118-119.

37. Sergeant DeLuca could smell raw marijuana within the vehicle when he spoke to the Defendant prior to the issuance of the warning. T, pp. 142, 153.

38. Defendant has used four aliases in addition to his birth name of Robert Skeffery: Paul Baker, Curtis Fearon, Clyde Ferron, and Lee Davis. T, pp. 188-190

## CONCLUSIONS OF LAW

1. The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

2. Probable cause must exist in order to justify the traffic stop of a motor vehicle because a stop of a motor vehicle "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment.]" *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769,

6

1772, 135 L.Ed.2d 89, 95 (1996)(citations omitted).

3. Probable cause is evaluated based upon a totality of the circumstances approach. *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 800, 157 L.Ed.2d 769, 775 (2003);*U.S. v. Glasser*, 750 F.2d 1197, 1205-1206 (3d Cir. 1984).

4. Trooper Berkebile, based upon the objective factor of his timing of the speed of the Defendant's Chrysler for 3/10 of a mile through the Allegheny Tunnel, possessed probable cause to conduct a traffic stop of that vehicle for a violation of the Pennsylvania law prohibiting operation of a motor vehicle in excess of the maximum speed limits and during such stop, a review of the Defendant's license and registration was permissible. *See U.S. v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989).

5. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005).

6. After the return of the Defendant's paperwork and issuance of a written warning by Trooper Berkebile, the traffic stop was terminated and the Defendant was not in custody; and Trooper Berkebile began to walk toward his patrol vehicle but the Defendant reinitiated contact with Trooper Berkebile which resulted in a consensual mere encounter between the two gentlemen.

7. In considering the totality of the circumstances, a seizure of the Defendant did not occur before or during Trooper Berkebile's discussion with the Defendant because the Defendant reinitiated contact with the Trooper; a reasonable person would have felt "free to leave" before and during this conversation with Trooper Berkebile. *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980); *Bostick v. Florida*, 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 399 (1991).

8. The Government bears the burden of demonstrating that a person, who is not in custody, voluntarily gave consent to search, "and [that such consent was] not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973).

7

9. Consent to search is determined through an evaluation of the totality of the circumstances. *Id.* at 227, 93 S.Ct. 2041, 2047-2048, 36 L.Ed.2d 854, 862-863 (1973).

10. "Voluntariness is a question of fact to be determined from all the circumstances,...." *Id.* at 248-249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875.

11. The Government has the burden of proof to demonstrate that consent to search was given by preponderance of the evidence. *U.S. v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1974). *See also U.S. v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

12. "[A] driver [of a vehicle] has the authority to consent to a full search of a vehicle." *U.S. v. Morales*, 861 F.2d 396, 399 (3d Cir. 1988).

13. In consideration of the totality of the circumstances, including the facts that the Defendant had previous experiences with law enforcement personnel, knew that he could refuse to grant consent to search, that the Defendant possessed four aliases in addition to his birth name, that two Pennsylvania State Police Troopers testified to witnessing the Defendant's consent to search after not obtaining written consent according to controlling state policy, Trooper Berkebile did not touch the Defendant after shaking hands with him after issuance of the warning, did not raise his voice to or draw his weapon on the Defendant, the Court finds Trooper Berkebile credible and concludes that the Defendant voluntarily provided consent to Trooper Berkebile to search the Chrysler.

14. The scope of the consent given by the Defendant was not limited in any way as Trooper Berkebile indicated that he was interested in the presence of any contraband including weapons and illegal substances and the Defendant, being aware of the object of the search, gave his consent to have the Chrysler searched without presenting any limitations on such a search, including any specific compartments of the vehicle or containers within the vehicle. *See Florida v. Jimeno*, 500 U.S. 248, 251-252, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297, 303 (1991).

15. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 335 (1984).

8

16. The determination of whether someone is "in custody" turns on the question of whether a reasonable man in the Defendant's position would feel he is deprived of his "freedom of movement." *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-1529, 128 L.Ed.2d 293-298 (1994).

17. The Defendant was in custody while sitting in the rear passenger seat of Trooper Berkebile's vehicle after having been placed under arrest; Trooper Volk "mirandized" the Defendant at this time and the Defendant indicated that he understood his rights.

18. Although silence of a defendant after being "mirandized" does not equate to a waiver of the rights required to be read under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), waiver of the *Miranda* rights can occur through means other than express written or oral statements of waiver; whether a waiver of *Miranda* rights has occurred is judged by the "particular facts and circumstances surrounding that case, including the background experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979).

19. In determining the validity of the waiver of a defendant's *Miranda* rights, the Court recognizes the law as set forth in *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed. 2d 286, 292 (1979): "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

20. In consideration of the fact that the Defendant has had previous encounters with law enforcement and understands English, the Court finds that the Defendant was aware that he could invoke his right to remain silent or waive his right to remain silent; after indicating that he understood his rights and responding to Trooper Volk that he did not "know anything about anything," the Court finds that the Defendant implicitly waived his right against self-incrimination as he failed to invoke his right to remain silent and stated his lack of knowledge regarding "anything."

21. Trooper Berkebile's questioning regarding the Defendant's use of marijuana did not violate the Defendant's rights under the Fifth and Sixth Amendments because the Defendant did not invoke his right to remain silent or his right to consult legal counsel.

22. Thus, Defendant's indication that an urinalysis would test positive because he smoked marijuana earlier in the day is admissible against the Defendant.

23. The Defendant's comments regarding his eating the marijuana in the baggie found in Trooper Berkebile's vehicle are admissible against the Defendant as the Defendant never invoked his right to remain silent at any time and answered Trooper Volk's questioning regarding his consumption of any illegal substances.

Therefore, the Motion to Suppress Evidence is denied.

## Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 16) and Motion to Suppress Evidence of Prior Deportation (Document No. 17)[2]

The Defendant requests that the Court order the Government to produce any evidence that it seeks to introduce at trial pursuant to Federal Rules of Evidence 404(b) and 609. The Government in response indicates that it will not introduce evidence pursuant to these rules, but it will seek to introduce evidence of the Defendant's previous deportation and presence "in the United States without having received the proper authorization" as such evidence is "intrinsic to the charged offense." Government's Brief, p.2.

The remaining charges in the indictment are found at Counts Two and Three respectively: Possession with Intent to Distribute Less than Fifty Kilograms of Marijuana in violation of 21 U.S.C. § 841 (a)(1) and 841(b)(1)(D) and simple possession of marijuana in violation of 21 U.S.C. § 844.

In *U.S. v. Conley*, 878 F.Supp. 751, 754 (W.D.Pa. 1994) Judge Lee, writing for this Court,

---

[2] Although the Court indicated that Count I of the indictment would be dismissed based upon the Defendant's unopposed motion found at Document Number 17, the Defendant in Document Number 17 also sought the suppression of any evidence of his deportation while the Government seeks its admission as evidence that is "intrinsic" to the remaining crimes charged. For this reason, the Court reviews this issue on the basis of whether the evidence is in fact intrinsic to the crimes charged in the indictment that have not been dismissed and therefore considers the motions in Document Number 16 and Document Number 17 together.

10

classified intrinsic acts into two categories:

> Conversely, acts intrinsic to the crimes charged are not excludable under 404(b). An uncharged act may not be extrinsic if: (1) The act was part of the scheme for which a defendant is being prosecuted; *Record*, 873 F.2d at 1372 n.5 or (2) The act was "inextricably intertwined with the charged crime such that a witness' testimony 'would have been confusing and incomplete without mention of the prior act.' "

(citations omitted).

> [T]he Third Circuit has recognized the application of Rule 404(b) to "extrinsic acts" but has not further recognized the dichotomy between extrinsic and intrinsic acts as set forth in the *Conley* opinion. *Government of Virgin Islands v. Archibald*, 987 F.2d 180, 184-185 (3rd Cir. 1993). *See also United States v. Butch*, 48 F. Supp. 2d 453 (D.N.J. 1999)(recognizing that the district courts of the Third Circuit are divided on the issue of whether the Third Circuit Court of Appeals has recognized the "intrinsic" and "extrinsic" dichotomy).

*U.S. v. Lafferty*, 372 F.Supp.2d 446, 463 (W.D.Pa. 2005). Indeed, the Third Circuit has come close to recognizing such a dichotomy, but has shied from explicitly recognizing "intrinsic" and "extrinsic" groupings. *See U.S. Blyden*, 964 F.2d 1375, 1378 (3d Cir. 1992)(recognizing that F.R.E. 404(b) is inapplicable in proving an assault as an essential element of the charged crime of possession of illegal firearm during a crime of violence); *U.S. v. Sumler*, 294 F.3d 579, 584 (3d Cir. 2002)(allowing use of Defendant's acts of brandishing weapon as proof of conspiracy without requiring compliance with F.R.E. 404(b)).

In the case *sub judice*, the Government seeks introduction of the Defendant's alleged status as a previously deported individual based upon the following argument:

11

> The evidence which the United States will seek to introduce is intrinsic to the crimes charged in Counts Two and Three of the Indictment in this case in that it establishes the basis for the trooper to have taken certain actions during the course of the traffic stop and is "inextricably intertwined" with the charged crime such that the trooper's testimony will be confusing and incomplete without mention of that evidence.

Government's Brief, p. 3.

The Court interprets the Government's intention as one seeking introduction of the proffered evidence under the second category outlined by Judge Lee. However, the Court does not find that such factor was inextricably intertwined with Trooper Berkebile's arrest of the Defendant on charges of possession within intent to distribute marijuana. From the evidence adduced at the suppression hearing, it is clear that the Defendant had several aliases and that the report Trooper Berkebile received from his dispatcher related that the Defendant may have been a deported felon. Yet, Trooper Berkebile possessed probable cause to stop the Defendant for speeding, thereafter smelled raw marijuana, obtained consent to search the vehicle, discovered raw marijuana, arrested the Defendant for his possession of it, later made inquiry of the Defendant as to possible driving under the influence of marijuana to which the Defendant admitted engaging in and then Trooper Volk later inquired of the Defendant if he orally consumed any illegal substances to which inquiry the Defendant admitting chewing marijuana found in Trooper Berkebile's vehicle.

The Court fails to see how the Defendant's alleged deportation for a felony conviction impacts upon the charges before the Court. The charges before the Court do not allege any importation of marijuana, the Defendant's involvement in international distribution of marijuana or even a conspiracy to import marijuana from the Defendant's birthplace of Jamaica. It is true that Trooper Berkebile had become aware through his dispatcher that the Defendant's criminal record included charges and

convictions for possession of illegal substances, distribution of such substances and the *possibility* that the Defendant may be a previously deported felon. While this fact of a possible deportation for a felony conviction on his record may have piqued Trooper Berkebile's interest, according to the record before the Court, the Defendant was not confirmed to be a deported felon by his dispatcher. Unlike the factors of prior felony convictions for possession and possession with intent to deliver controlled substances, the smell of raw marijuana, the presence of several air fresheners in the Chrysler, the Defendant's nervousness, the smell of marijuana on the Defendant, the record of various aliases used by the Defendant, and the fact that the Defendant was driving a rental car (a tool commonly known by law enforcement and the Court as one used by drug couriers), the fact that the Defendant is or might be a previously deported felon is not "inextricably intertwined" and is not an important factor in Trooper Berkebile's calculation concerning his investigation of possession with intent to distribute marijuana to the extent that his investigation and even the basis for his search, which was consented to, could not be understood without such information being presented to the jury. The exclusion of the information regarding the Defendant's deported status, when removed from the background information of the traffic stop does not create such a void in the circumstances of the stop and the subsequent consent to search and arrest of the Defendant so as to confuse one trying to understand the charged crimes. To the extent that the Defendant's previous deportation as a felon is a factor at all in this case and the charged crime, it is a minor factor and is not intrinsic to the charged crime.

Therefore, the Court finds that the evidence that the Defendant was possibly a previously deported felon or the confirmed evidence subsequently found after his arrest that the Defendant was previously deported for a felony conviction, whether such deportation was within or without the

requirements of procedural due process, is hereby excluded from introduction in trial in this matter as intrinsic evidence.

**AND NOW**, this 22nd day of May, 2006, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion to Suppress Evidence (Document No. 15) is DENIED, Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 with Citation of Authority (Document No. 16) is GRANTED AS MOOT and Motion to Suppress Evidence of Prior Deportation and Related Motion to Dismiss Count I of the Indictment with Citation of Authorities (Document No. 17) is GRANTED as unopposed as to the dismissal of Count I by the Government and GRANTED as to the suppression of any evidence of deportation.

IT IS FURTHER ORDERED THAT Count I of the Indictment (Document No. 1) is DISMISSED; and IT IS FURTHER ORDERED that any evidence regarding the Defendant's status as a previously deported felon shall not be admissible at trial as "intrinsic" evidence pursuant to Federal Rule of Evidence 404.

BY THE COURT:

*/s/ Kim R. Gibson*

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**